## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Criminal No.** |
| **v.** ) | **08-40022-FDS** |
| ) | |
| **T. PATRICK KEARNEY,** ) | |
| ) | |
| **Defendant.** ) | |

---

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

**SAYLOR, J.**

This is a prosecution for transportation, distribution, and possession of child pornography. Defendant T. Patrick Kearney has moved to suppress various items of evidence seized from his house as a result of a search and statements that he made in an interview during the search.

FBI agents executed a search warrant at Kearney's home on July 10, 2008. During the search, and without first receiving his *Miranda* rights, Kearney was interviewed by two FBI agents and made incriminating statements. Kearney was then indicted on August 20, 2008 with transportation, distribution, and possession of child pornography. Kearney contends that the warrant was not supported by probable cause as required by the Fourth Amendment and that he was not provided with *Miranda* warnings as required by the Fifth Amendment.

On October 29, 2009, the Court held an evidentiary hearing on the motion to suppress. The Court heard testimony from Kearney; his live-in partner, Karen Minardi; FBI Special Agents Jennifer L. Weidlich, Albert Lamoreaux, and Gary Cacace; and Brian Carne, an Internet

protocol expert.

For the reasons that follow, the Court concludes that the warrant was supported by probable cause and that, in any event, officers executed the search in good faith reliance upon it. The Court also holds that Kearney was not in custody when he was questioned and thus that *Miranda* warnings were not required. The motion to suppress will therefore be denied.

I.      **Background**

    A.      **The Affidavit and Warrant**

On May 3, 2008, an undercover investigator from the Lexington, Virginia Police Department connected to the Internet via "chat-avenue.com," a teen-only chat area. The undercover agent logged on using the screen name "Julie_a2011" and posed as a 14-year-old female from Virginia named "Julie." That same day, "Julie" was contacted by someone using the screen name "padraigh8" who identified himself as a 28-year-old male from Massachusetts. Padraigh8 requested that "Julie" converse with him through the Yahoo! messenger service. Over the next hour, padraigh8 asked "Julie" questions concerning her dating and sexual habits and the two exchanged purported photos of one another. (July 7, 2008 Weidlich Aff. ¶ 13).

Throughout May and June 2008, padraigh8 and "Julie" engaged in numerous on-line conversations.[1] (*Id.* ¶ 22(a)-(j)). During these communications, padraigh8 sent "Julie" videos and images containing child pornography and also indicated a desire to travel to Virginia to meet and have sex with her. (*Id.* ¶ 13). On one occasion, padraigh8 told "Julie" that his last name was "Carney." (*Id.* ¶ 22(h)). Through investigation, the undercover officer in Virginia determined that padraigh8 had a MySpace page with a URL of http://www.myspace.com/padriagh8. (*Id.*

---

[1] The specific dates of these communications were May 3, 12, 17, and 26 and June 6, 9, 13, 15, and 27. (July 7, 2008 Weidlich Aff. ¶ 22(a)-(j)).

¶ 14).[2]

On May 12, 2008, the undercover agent who had been posing as "Julie" contacted the FBI in Boston regarding the results of his investigation to date. (*Id.* ¶ 15). At that point, Special Agent Jennifer Weidlich became involved in the investigation.

In order to determine the identity of padraigh8, Weidlich served an administrative subpoena on MySpace, requesting account and IP address information associated with the URL http://www.myspace.com/padriagh8. MySpace responded that the subscriber associated with this URL had registered with MySpace.com on August 23, 2007, utilizing IP address 68.116.165.4. (*Id.* ¶ 17).

An IP address is a numerical identification of a computer on the Internet. It is the so-called "address" from which a subscriber requests information and to which the information is sent to the subscriber. Internet Service Providers ("ISPs") each possess a finite number of unique IP addresses that they assign to their subscribers. (Carne Aff. ¶ 2).

IP addresses are often "dynamic" (that is, changing), meaning that an ISP might assign each subscriber a different IP address after a certain number of hours, days, or weeks logged onto the system. When a computer is configured by the administrator to use the same IP address every time the subscriber logs onto the system, this is known as a "static" IP address. (*Id.* ¶ 3).

By itself, knowing that a website was accessed by a certain IP address will not disclose the physical location of the computer associated with that address. To discover that location, one must obtain additional information, such as an ISP's log of IP addresses assigned to its subscribers for the particular time in question, as well as the subscriber's registered address. (*Id.*

---

[2] URL stands for Uniform Resource Locator, an Internet address that describes the location of a specific site or document.

¶ 5).

MySpace informed Weidlich that the subscriber had provided a name of "Padraigh NoName," an address in Westborough, Massachusetts, and an e-mail address of padraigh9@hotmail.com.  Moreover, MySpace provided IP log records indicating that the subscriber had signed onto this MySpace account from IP address 68.116.165.4 multiple times between August 23, 2007, and May 22, 2008, and that the account was still active.  (July 7, 2008 Weidlich Aff. ¶ 17).

Weidlich also served a subpoena on Yahoo!, requesting all account, subscriber, billing, and IP information associated with the screen name "padriagh8."  Yahoo! responded that the screen name was linked to an account created on October 24, 2000, by a "Padriagh No Name." The login name linked to the account was "padriagh8" and listed e-mail addresses of padraigh8@yahoo.com and padriagh9@hotmail.com.  As a residential address, the subscriber provided only a postal code of 55455.[3]  According to Yahoo!'s IP log records, the subscriber had accessed his account 288 times between April 7, 2008, and May 21, 2008, utilizing the IP address 68.116.165.4.  (*Id.* ¶ 18).

After determining that IP address 68.116.165.4 was issued by Charter Communications, an ISP, Weidlich served a subpoena on Charter.  Weidlich sought information concerning IP address 68.116.165.4, particularly information that would identify to whom the subject IP address was assigned between the dates of May 20 and May 22, 2008.  The company responded that during those dates the IP address belonged to Patrick Kearney, who resided at 11 Morgan Drive, North Grafton, Massachusetts.  (*Id.* ¶ 19).  Upon receiving this information, Weidlich

---

[3] The zip code 55455 is assigned to Minneapolis, Minnesota.

retrieved records from the Massachusetts Registry of Motor Vehicles and determined that his full

name is T. Patrick Kearney, that he was born in 1948, and that he resided at 11 Morgan Drive,

North Grafton, Massachusetts.  (*Id.* ¶ 20).

Between June 17 and June 23, 2008, Weidlich reviewed the MySpace page located at

http://www.myspace.com/padraigh8.  The user of that page identified himself as Padraigh, a 50-

year-old male living in Westborough, Massachusetts.  (*Id.* ¶ 21).[4]

On July 7, 2008, Weidlich prepared an affidavit in support of an application for a warrant

to search Kearney's residence in North Grafton.  (*Id.* ¶ 35).  The affidavit attested to, among

other things, those facts described above.  A magistrate judge issued the warrant on the same

day.

### B.      The Search and Interrogation

Between 6:30 and 6:40 a.m. on July 10, 2008, eight agents from the FBI and two officers

from the Grafton Police Department arrived at Kearney's residence at 11 Morgan Drive in North

Grafton.  (Tr. at 36).  At the time, both Kearney and his live-in partner, Karen Minardi, were on

the second floor of the home; Kearney was asleep and Minardi was awake.  (*Id.* at 110).  Officers

rang the doorbell, knocked on the front door, and announced their presence.  From her vantage

point at the top of the stairs, Minardi was able to see outside and identify the "FBI" vests worn

by some of the agents.  (*Id.* at 114).  Minardi, who was wearing her night clothes, woke up

Kearney and asked him to go downstairs to answer the door.  (*Id.* at 114).  Kearney got out of

bed, got dressed, brushed his teeth, and went downstairs to open the door.  (*Id.* at 145).

Approximately five minutes had elapsed from the time agents first announced their presence

---

[4] The Town of Westborough abuts the Town of Grafton.

until Kearney answered the door.  (*Id.* at 39).

   Once Kearney opened the door, the agents entered into the home and shortly thereafter fanned throughout the house.  (*Id.* at 39-40, 42).  Because agents were aware the Kearney owned at least one firearm, their first priority was to secure the premises.  (*Id.* at 38).  Kearney was provided a copy of the search warrant and immediately asked a number of questions, including questions as to whether there was anyone else in the house and where the firearm was located.  (*Id.* at 42, 150).  Kearney, who testified to being shocked by the situation and the number of questions asked simultaneously, responded that his girlfriend was upstairs.  (*Id.* at 145-47, 153).

   Minardi came downstairs while agents continued to ask whether there was anyone else was in the house; Kearney responded, "No."  (*Id.* at 146-47).[5]  Special Agent Gary Cacace again asked where the firearm was located.  (*Id.* at 99-100).  Kearney began to move toward the first floor office in his home in an effort to show Cacace where he kept the firearm.  (*Id.* at 45-46, 99-100, 146-47).[6]  Cacace grabbed Kearney's arm to prevent him from going into the office; other agents went into the room to retrieve the gun.  (*Id.* at 100-01).  After agents had secured the firearm, Cacace, believing that Kearney had lied about his ownership of the weapon, told Kearney, "You have already lied to me [about the gun] but I won't hold it against you."  (Cacace

---

   [5] On this point, there is some dispute.  Cacace testified that Kearney's answer was in response to his question as to whether Kearney owned a firearm.  (Cacace Aff. ¶ 5; Tr. at 99-100).  According to Kearney, because of the number of questions being thrown at him simultaneously, and because Minardi had at this point made her way downstairs, he was attempting to tell the agents that no other individuals (besides Minardi) were in the home.  (Tr. at 146-47).  The Court credits Kearney's testimony, which is consistent with the somewhat chaotic nature of the agents' initial entry into the house and Kearney's own subsequent behavior; upon being asked once again where the firearm was located, Kearney immediately moved toward his first floor office to show agents where he kept the firearm.  (*Id.* at 148).  It makes little sense that Kearney would initially lie about owning a gun only to immediately disclose the location of the firearm he had just claimed not to own.

   [6] Kearney testified that in addition to moving toward his office, he told the agents that the gun was located in the bottom drawer of his cabinet.  (Tr. at 147).  Cacace could not recall whether Kearney made a verbal response to his question.  (*Id.* at 99-100).

6

Aff. ¶ 5).  At some point during this initial interaction, Kearney was also told that he was not

under arrest.  (Tr. at 74; Sep. 4, 2009 Weidlich Aff. ¶ 4).  The group remained near the front door

until agents had secured the house.  (Tr. at 47, 74, 82-84).

After agents completed the security sweep of the home, Weidlich told Kearney again that

he was not under arrest and explained to him that he was free to leave at any time but that this

was his opportunity to explain his side of the story.  (*Id.* at 60-61).  Kearney agreed to speak with

the agents and suggested that they sit at the kitchen table.  (*Id.* at 61, 150-51).  Weidlich and

Special Agent Albert Lamoreaux, who had removed their bulletproof vests, (*id.* at 163), went

with Minardi and Kearney into the kitchen.  (*Id.* at 151).[7]  According to Kearney's testimony,

Lamoreaux told him that nothing Kearney said would be used against him.  (*Id.* at 164).

Lamoreaux denies making such a statement.  (Lamoreaux Aff. ¶ 6).

All four—Kearney, Minardi, Weidlich, and Lamoreaux—sat down at the kitchen table.

Kearney was then interviewed for approximately one hour while the other agents conducted the

search of the house.  (Tr. at 48).[8]  At no point during the process was Kearney ever advised of his

*Miranda* rights.  (*Id.*).  Most of the questions came from Weidlich, while some came from

Lamoreaux.  Minardi testified that Weidlich's questions were "about the business at hand," and

she described Lamoreaux's tone as conversational.  (*Id.* at 128-29).  In response to these various

questions, Kearney made several incriminating statements.

With only a few exceptions, Kearney, Minardi, Weidlich, and Lamoreaux remained at the

---

[7] At some point during the search, Minardi asked if agents could remove their shoes because of the white carpet.  Lamoreaux responded that the agents would have to keep their shoes on.  (Tr. at 87).

[8] Minardi made some coffee that both she and Kearney drank during the interview.  (Tr. at 128). Lamoreaux brought a cup of coffee from a Dunkin' Donuts; Minardi may have refilled his cup at some point as well. (*Id.* at 88).

table for the entire interview.  At one point during the interview, Weidlich and Kearney moved away from the table so Weidlich could ask Kearney some sensitive questions without upsetting Minardi.  (*Id.* at 52).[9]  At another point, when the telephone rang, Minardi got up from the table to answer the telephone.  (*Id.* at 127).[10]  Kearney at one point asked Lamoreaux whether he could use the bathroom located just off of the kitchen.  Lamoreaux responded that he could.  (*Id.* at 158).  Lamoreaux stayed seated at the table and did not ask that Kearney keep the door to the bathroom open.  (*Id.* at 169).[11]

The interview concluded after approximately one hour.  Weidlich then explained to Kearney what would happen next; among other things, she explained the process of forensic examination and what would happen to the evidence seized by the agents.  (*Id.* at 61).  Weidlich then proceeded to assist other agents as they searched the home.  (*Id.*).  Sometime around 9:00 a.m., the search concluded and the agents left the house.  (*Id.* at 77, 99).  Among other things, agents seized five computers, four hard drives, miscellaneous additional computer hardware, travel documents, three cameras and related equipment, and numerous VHS tapes and compact disks.  (Dkt. # 3, ¶ 17).

---

[9] In addition, at some point prior to the interview, Weidlich had learned that Minardi's brother, who worked for the Grafton Police Department, had passed away and that the wake or funeral was scheduled to take place on the afternoon of the search.  (Tr. at 61, 87).  During the interview, Weidlich expressed her condolences to Minardi and apologized for the timing of the search.  (*Id.* at 61-62).  Minardi did not recall receiving condolences from Weidlich.  (*Id.* at 128).  Rather, according to Minardi, it was the Grafton officers who expressed their condolences.  (*Id.*).

[10] There is no dispute that agents told Minardi she could answer the telephone.  (Tr. at 54-55, 127).  What is in dispute, however, is whether Minardi asked for permission.  She claims she did; the agents claim she did not.  (*Id.* at 54-55, 127, 133)

[11] During her testimony on direct examination, Minardi recalled another occasion when she asked permission to get up from the table to use the upstairs bathroom.  (Tr. at 124-25).  However, on cross-examination, Minardi clarified that she went upstairs at the request of Weidlich in order to retrieve a key for a trunk the agents intended to search.  (*Id.* at 138-40).  During this trip upstairs, Minardi also used the bathroom.  (*Id.*).  It appears that these events occurred *after* the interview was completed.

Based in part upon the evidence seized at his home and the statements he made, Kearney was subsequently indicted with transportation, distribution, and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(1), (a)(2), and (a)(4)(B).  On August 21, 2009, Kearney filed the present motion to suppress.

## II.     Analysis

Defendant first argues (1) that the warrant was issued without probable cause and (2) that agents did not act in good faith reliance upon it when conducting the search, all in violation of the Fourth Amendment.  Defendant seeks suppression of all evidence seized during the search as well as all statements made during the questioning that occurred attendant to the search.  In the alternative, defendant relies upon the *Miranda* requirement of the Fifth Amendment and seeks to suppress the statements he made in response to questioning by Weidlich and Lamoreaux.  The Court will address each of these arguments in turn.

### A.     The Fourth Amendment

#### 1.     Probable Cause

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause."  U.S. CONST. AMEND. IV.  Pursuant to these guarantees, a "warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 42, 48 (1st Cir. 2005) (quotation omitted).  In reviewing the warrant, the Court must pay "great deference" to the magistrate's determination of probable cause and should not

upset that determination unless the magistrate lacked a "substantial basis" for concluding that the search would uncover evidence of wrongdoing. *United States v. Santiago*, 389 F. Supp. 2d 124, 127 (D. Mass. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). There is no dispute that Weidlich's affidavit established probable cause to believe that a crime had been committed; the Court, therefore, need only decide whether the affidavit established probable cause to believe that evidence of the crime would be found at defendant's home.

Applying the nexus requirement requires "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Given the wide variety of factual contexts in which the probable cause requirement applies, this is obviously a somewhat amorphous inquiry. At its base, however, the nexus requirement is satisfied if a person of reasonable caution has reason to believe that evidence of a crime will be found at the place to be searched. *United States v. Rodrigue*, 560 F.3d 29, 32 (1st Cir. 2009).

Defendant contends that the affidavit fails to establish probable cause because it does not demonstrate that IP address 68.116.165.4 "belonged" to him on any of the dates in 2008 when padraigh8 chatted with "Julie" (that is, May 3, 12, 17, and 26 and June 6, 9, 13, 15, and 27). (Def. Mem. at 8). According to defendant, the information received from Charter Communications, as recounted in the affidavit, establishes only that IP address 68.116.165.4 belonged to defendant and was registered to his home between May 20 and 22, 2008. (*Id.*). Thus, defendant contends, the nexus requirement is not satisfied because the affidavit does not show that defendant's home was associated with the subject IP address when the alleged criminal activity occurred. (*Id.* at 7-9). Moreover, because the affidavit does not indicate that

10

the subject IP address was static as opposed to dynamic, defendant contends that it is not proper

to infer that IP address 68.116.165.4—which admittedly belonged to him between May 20 and

22, 2008—also belonged to him on other dates.  (*Id.* at 9-11).

The government responds that the affidavit, in its totality, establishes a fair probability

that evidence would be found at defendant's home.  (Gov't Mem. at 3-5).  The government

contends that the affidavit connects defendant to the subject IP address and therefore provides a

basis for a chain of inferences that would warrant a person of reasonable caution to conclude that

evidence would be found at 11 Morgan Drive in North Grafton.  (*Id.* at 3-4).  Finally, the

government downplays the significance of the dynamic-versus-static distinction, arguing that it

is superfluous in a contextual inquiry such as this one.  (*Id.* at 5-6).

Based on the totality of the circumstances, the Court concludes that the affidavit

establishes probable cause to believe that evidence of the alleged criminal activity would be

found at defendant's home.  The affidavit, fairly read, establishes three propositions which, when

combined, provide the required nexus.  First, padraigh8's Yahoo! and MySpace accounts are the

conduits of the alleged criminal activity in this case.  Padriagh8 utilized the Yahoo! account to

chat with "Julie" and to send her child pornography on certain occasions during May and June,

2008.  (July 7, 2008 Weidlich Aff. ¶ 13).  Moreover, padraigh8 maintained a MySpace page with

an e-mail address of padraigh9@hotmail.com, one of the e-mail addresses associated with the

Yahoo! account.  (*Id.* ¶¶ 17, 18).  Therefore, both Internet services are connected to padriagh8's

alleged criminal activities.

Second, the affidavit demonstrates that IP address 68.116.165.4 belonged to defendant

and was registered to 11 Morgan Drive, North Grafton, Massachusetts, from May 20 to 22, 2008.

(*Id.* ¶ 19).

Third, and most crucially, the affidavit links defendant's "ownership" of IP address 68.116.165.4 on May 20 to 22, 2008, to the Internet persona padriagh8 and the associated Yahoo! and MySpace accounts.  Although there is no averment in the affidavit that the subject IP address belonged to defendant on the dates of the alleged chats between padriagh8 and "Julie," the affidavit provides probable cause to believe that defendant accessed padriagh8's Yahoo! and MySpace accounts on May 21 and 22, 2008.  Paragraph 18 of the affidavit states: "[P]adriagh8 accessed his [Yahoo!] account 288 times utilizing IP protocol address 68.116.165.4 between 4/7/08 and *5/21/08*." (*Id.* ¶ 18 (emphasis added)).  Paragraph 17 states:  "IP log records from MySpace show that the user signed onto this MySpace account from IP address 68.116.165.4 multiple times between 8/23/07 and *5/22/08*".  (*Id.* ¶ 17 (emphasis added)).  A fair reading of these statements is that, as of the date of the subpoenas, the Yahoo! and MySpace accounts had last been accessed by IP address 68.116.165.4 *on* May 21 and 22, 2008, respectively.  Had the accounts last been accessed on some earlier dates, those earlier dates would have appeared in the affidavit in place of "5/21/08" in paragraph 18 and "5/22/08" in paragraph 17.[12]  And because there is no dispute that IP address 68.116.165.4 belonged to defendant and was registered to 11 Morgan Drive, North Grafton, Massachusetts, on May 21 and 22, the affidavit fairly connects defendant to the screen name padriagh8 and the associated

---

[12] One might argue that this reading of the affidavit is not the most reasonable, in light of the fact that the subpoenas to Yahoo! and MySpace were issued on May 22, 2008.  This might explain why MySpace's response to the subpoena covered the dates of August 23, 2007 (when the MySpace account was created) until May 22, 2008 (when the subpoena was issued).  (*See* July 7, 2008 Weidlich Aff. ¶ 17).  Such an argument, however, would not account for Yahoo!'s response to the subpoena, which covered the dates between April 7, 2008 through May 21, 2008, the day *before* the subpoena.  (*See id.* ¶ 18).  When read together, therefore, it does not appear that the date of subpoena dictated the dates covered by Yahoo!'s and MySpace's response to the subpoenas.  Rather, it appears that, as of the date of the subpoena, the Yahoo! and MySpace accounts had last been accessed on May 21 and 22, 2008, respectively.

Yahoo! and MySpace accounts.

When combined, these three propositions would warrant a person of reasonable caution to believe that evidence of the alleged crimes would be found at defendant's residence. The affidavit connects defendant and his home to IP address 68.116.165.4 from May 20 to 22, 2008; it establishes that the subject Yahoo! and MySpace accounts were accessed by that IP address between May 20 and 22, 2008; and it links those accounts to the alleged criminal activity.[13] That is sufficient to establish the required nexus between the offense being investigated (transportation, distribution, and possession of child pornography) and the place to be searched (defendant's home). The Court concludes, therefore, that the warrant was supported by probable cause.

### 2.       The Good-Faith Exception

Even in the absence of probable cause, the Court will not suppress evidence seized pursuant to a warrant if officers executed the search in good faith reliance upon it. *United States v. Leon*, 468 U.S. 897, 923-24 (1984). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. Thus, when police seize evidence in objectively reasonable reliance on a subsequently invalidated search warrant, the good-faith exception applies and suppression is generally not appropriate. The Supreme Court in *Leon* identified four circumstances where the good-faith exception would not apply: first, when the magistrate or judge in issuing a warrant was misled by information in an

---

[13] Defendant's emphasis on the dynamic-versus-static distinction is therefore off the mark. Whether IP address 68.116.165.4 is dynamic or static, it is uncontested that it belonged to defendant *at all times* between May 20 and 22, 2008. (July 7, 2008 Weidlich Aff. ¶ 19). Moreover, the affidavit establishes that the subject Yahoo! and MySpace accounts were accessed by IP address 68.116.165.4 during that time period. Because each IP address is unique, it is fair to infer that defendant accessed the Yahoo! and MySpace accounts between May 20 and May 22, 2008, which accounts are connected to the alleged criminal activity.

affidavit that the affiant knew was false or would have known was false except for his reckless

disregard of the truth; second, when the issuing magistrate wholly abandoned his judicial role;

third, when the supporting affidavit is so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable; and fourth, when the warrant is so facially deficient

that the executing officers cannot reasonably presume it to be valid. *Id.* at 922-23.  For the

purposes of the present motion, the Court need only consider the third possibility.  The

government bears the burden of establishing the applicability of the good-faith exception.

*United States v. Diehl*, 276 F.3d 32, 42 (1st Cir. 2002).

    Even assuming that the warrant was not supported by probable cause, the Court

concludes that the good-faith exception precludes suppression.  Weidlich's affidavit is not the

sort of "bare bones" document upon which an agent could not reasonably rely.  *See id.* at 43

("Here, as [the] summary of the affidavit indicates, there was an abundance of detail.  Whether

or not probable cause existed . . . , at the very least the affidavit was far from bare bones.").  To

the contrary, the affidavit is quite detailed and provided ample information from which an officer

could conclude that probable cause existed.

    Defendant correctly notes that the affidavit does not *expressly* state whether padriagh8

accessed the Yahoo! or MySpace accounts using IP address 68.116.165.4 between May 20 and

May 22, 2008.  (Def. Reply at 5).  But, for the reasons described above, a fair reading of the

affidavit is that defendant in fact accessed those accounts on May 21 and May 22, respectively.

(*See* July 18, 2008 Weidlich Aff. ¶¶ 17-18 (stating that padriagh8 accessed his Yahoo! account

between April 7, 2008, and May 21, 2008, and his MySpace account between August 23, 2007,

and May 22, 2008)).  In any event, it certainly would not have been unreasonable for an agent to

read the affidavit in the same way as the Court.

Defendant is also correct that the affidavit does not use model language from the
Department of Justice Manual on Searching and Seizing Computers and Obtaining Electronic
Evidence in Criminal Investigations.  (Def. Reply at 8).  Nor does it mention the dynamic/static
distinction.  (*Id.*).  But neither omission is fatal to a good faith determination.  Whether it
arguably would have been better for the affidavit to include discussion of these topics is not the
question.  Rather, the proper inquiry is whether the affidavit had ample indicia of probable cause
to render official belief in its existence reasonable.  *See Leon*, 468 U.S. at 923.  Here, the
affidavit unquestionably did, and therefore the good-faith exception of *Leon* applies.

### B.     The Fifth Amendment

The Fifth Amendment guarantees that no "person . . . shall be compelled in any criminal
case to be a witness against himself."  U.S. CONST. AMEND. V.  Pursuant to that guarantee, a
suspect must be advised of his *Miranda* rights prior to a custodial interrogation.  *Dickerson v.
United States*, 530 U.S. 428, 438 (2000); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A court
must generally suppress statements made by a suspect during a custodial interrogation if the
suspect was not advised of his *Miranda* rights.  *Dickerson*, 530 U.S. at 435.  There is no question
that defendant was interrogated at the time of his statements.  The only disputed issue is whether,
for *Miranda* purposes, defendant was in custody.

Relying almost exclusively on the First Circuit's decision in *United States v. Mittel-
Carey*, 493 F.3d 36, 39 (1st Cir. 2005), defendant contends that he was in custody at the time of
his statements.  (Def. Mem. at 12-15).  He emphasizes that he was questioned in his home during
the early morning hours while a search was being executed.  (*Id.* at 12).  Noting that he felt

compelled to ask for permission to use the bathroom, defendant argues that police exerted physical control over him and even grabbed him by the arm on one occasion.  (*Id.* at 14).

The touchstone of the custody inquiry "is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Mittel-Carey*, 493 F.3d at 39 (quotation omitted).  In conducting the inquiry, a court must consider the totality of the circumstances and ask whether "a reasonable person [would] have felt he . . .was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  While no list of factors is exhaustive, the First Circuit has identified at least four factors that should be considered in making the custody determination:  whether the suspect was questioned in familiar or at least neutral surroundings; the number of law enforcement officers present at the scene; the degree of physical restraint placed upon the suspect; and the duration and character of the interrogation.  *Mittel-Carey*, 493 F.3d at 39; *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987).

Considering these factors, the Court concludes that defendant was not in custody at the time he made his statements.  Defendant was questioned in the familiar setting of his own home, while sitting at his kitchen table.  Two agents, who never unholstered their weapons and were not wearing bullet-proof vests, sat at the table, along with defendant's partner.  The agents made no effort to separate defendant from his partner during or after the interview.  The agents did not physically restrain the defendant by forbidding him to get up from the table, even if they briefly prevented him from going into his office earlier in the encounter.[14]  Although defendant testified to feeling compelled to ask for permission before using the bathroom, agents did not insist in

---

[14] The agents' actions in this regard are entirely understandable, as they were trying to secure a weapon that they knew was somewhere in the home.

16

advance that such permission would be required, nor did they stand guard outside the bathroom

door or insist that it remain slightly open so they could monitor defendant's activities.  And

while the questioning lasted an hour, the record indicates the discussion was straightforward and

even conversational.  Even if agents told defendant that nothing he said would be used against

him (which the agents deny), there is no other evidence that the agents used subtle interrogation

techniques to coax incriminating responses from defendant.  In the end, Court is not convinced

that a reasonable person in defendant's position would have felt unable to terminate the

interview and leave.  *See Masse*, 816 F.2d at 809 (articulating custody standard).

The facts in *Mittel-Carey*, on which defendant relies, are distinguishable.  In that case,

eight agents arrived at the defendant's home at 6:25 a.m. to execute a search warrant.  The

defendant was asleep upstairs with his girlfriend when the agents arrived.  After the girlfriend

answered the door, two agents went upstairs and confronted the defendant in his darkened

bedroom.  One agent had a flashlight and an unholstered weapon.  The agents ordered the

defendant to get dressed and escorted him downstairs to the living room.  They questioned him

for up to two hours.  Agents told the defendant that he would be better off if he answered their

questions at the outset of the investigation and that there was a specific sentencing guidelines

provision that might qualify him for an acceptance of responsibility reduction if he cooperated.

When the defendant asked whether he should have a lawyer present, an agent responded that "he

could not advise him on way or the other" but that it "if he got an attorney, the attorney was

going to tell him not to speak to the FBI."  *Mittel-Carey*, 493 F.3d at 38.  The defendant was

separated from his girlfriend for the entirety of the interview and was only allowed to leave the

living room on three occasions:  first, to have a short, supervised conversation with his girlfriend

before she left for work; second, to use the bathroom, during which time an agent stood just outside the slightly open bathroom door; and third, to feed his pet rabbits after the interview was complete.  *Id.* at 39.  Of these facts, the one that carried the most weight with the court was "the level of physical control that the agents exercised over the defendant during the search and interrogation."  *Id.* at 40.

While superficially somewhat similar to *Mittel-Carey*, the facts here are significantly different.  Defendant was not confronted in his darkened bedroom by agents with an unholstered firearm and a flashlight; rather, by defendant's own testimony, it was light outside when the agents arrived**,** and he had time to brush his teeth and put on clothes before answering the door. *See id.*  Defendant's movements were not appreciably restricted; on the contrary, he was free to use the bathroom as he requested, and he was not supervised by agents when he did so.  *See id.* Defendant was not separated from his partner in an effort to intimidate or isolate him or exploit their separation; to the contrary, he was with Minardi at the kitchen table through almost all of the interview.  *See id.*  Finally, defendant was not subjected to coercive statements of the sort employed in *Mittel-Carey*; rather, the interview was a straightforward exchange of questions and answers.  In sum, despite some similarities, *Mittel-Carey* does not warrant a finding that defendant's statements in this case were the result of a custodial interrogation.

**III.**   **Conclusion**

The Court concludes that the warrant was supported by probable cause and that, in any event, agents executed the search in good faith.  Moreover, because defendant was not in custody at the time of his statements, the agents' failure to provide *Miranda* warnings does not compel suppression.  For these reasons, defendant's motion to suppress is DENIED.

18

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: November 30, 2009